**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DIANNE M. THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10-cv-123 |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW PETROF, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., District J.,

This civil rights action arises out of events transpiring in the early morning hours of October 31, 2009, when Plaintiff Dianne M. Thompson was stopped for minor traffic violations by Defendant Matthew Petrof, a Pennsylvania State Trooper, and allegedly arrested, without probable cause, for driving under the influence of alcohol. Plaintiff contends that Trooper Petrof violated her constitutional rights in arresting her and subjecting her to a blood draw.

Presently pending before me is the Defendant's motion for summary judgment. For the reasons set forth below, the motion will be granted in part and denied in part.

## I.    BACKGROUND

Plaintiff is the owner of the Corner Bar & Grill located in Bradford, Pennsylvania. At all times relevant to this lawsuit, Plaintiff's brother, Don Cummins, was a member of the Bradford Township Board of Supervisors, and her other brother, Bob Cummins, was a local contractor. On June 6, 2009 and again on August 21, 2009, the local Bradford

1

newspaper published guest commentaries written, respectively, by Don and Bob Cummins.  Both commentaries were critical of the practices then being employed by the Pennsylvania State Police operating within the Bradford area.  Trooper Petrof was among the Pennsylvania State Police officers stationed in the Kane Barracks and assigned to the Bradford area during this time.  It is undisputed that Trooper Petrof was acquainted with the Plaintiff and her brothers, knew that Plaintiff owned the Corner Bar & Grill, and was also aware of the guest commentaries written by the Cummins brothers.

At approximately 1:00 a.m. on the morning of October 31, 2009, Plaintiff was operating her vehicle after having left the Corner Bar & Grill.  As she drove home, Plaintiff was observed by Trooper Petrof stopping at a yellow flashing light for a prolonged period of time and tossing a lighted cigarette butt out of her car window. Based on these observations, Trooper Petrof signaled for Plaintiff to pull over, unaware that Plaintiff was the driver of the vehicle.

At the time of this incident, Plaintiff had not consumed any alcoholic beverages throughout the day and her blood alcohol content was zero.  There was no alcohol present in her vehicle.  Nonetheless, after approaching Plaintiff's vehicle, Trooper Petrof stated that the Plaintiff smelled of alcohol and appeared to have bloodshot and glassy eyes.  Plaintiff contends she denied smelling of alcohol or having consumed any alcohol that day.  Trooper Petrof then ordered Plaintiff out of the car and directed her to perform several field sobriety tests – specifically, the Horizontal Gaze Nystagmus (HGN) test, the heel-to-toe walk, and the one-legged stand.

Plaintiff was first directed to perform the Horizontal Gaze Nystagmus test.  The parties dispute whether Plaintiff actually attempted to perform this test.  Trooper Petrof contends that Plaintiff refused to perform the HGN.  Plaintiff insists that she attempted the test but had difficulty with it because Trooper Petrof gave confusing and conflicting directions as to how the test should be performed.

With regard to the second field sobriety test, the heel-to-toe walk, it is admitted that Plaintiff lost her balance during her attempt to perform this test.  While Trooper Petrof claims this was a sign of intoxication, Plaintiff contends that her difficulties were the result of attempting to perform the test on an inclined surface.

As for the one-legged stand, there is no dispute that Plaintiff refused to perform this particular test.  Plaintiff contends that she refused due to her belief that she would be unable to successfully perform the test in light of the inclined surface she was on. Trooper Petrof denies that the surrounding pavement was sloped and claims that the area was actually flat and well-lighted from the police cruiser's "take-down" lights.

Following these events, Trooper Petrof attempted to perform a preliminary breath test (PBT) on the Plaintiff, but Plaintiff refused because, she claims, she did not trust Trooper Petrof to administer the test accurately and fairly.  Instead, she was handcuffed, placed in the back of a police vehicle, and taken to the Bradford Regional Medical Center for a blood draw.  Plaintiff claims she agreed to the blood draw only because she believed she would have to choose between the PBT and a blood draw or risk losing her driver's license for a year.

The results of the blood test confirmed that Plaintiff had no alcohol in her bloodstream.  Plaintiff was then re-handcuffed, taken back to her vehicle, and released.

3

Subsequently, Trooper Petrof issued citations against Plaintiff for remaining stationary too long at the yellow flashing light and for littering.  The matter eventually proceeded to a summary trial before a district justice, who found Plaintiff not guilty of the summary offenses.

Meanwhile, Robert Cummins, having become aware of his sister's traffic stop and arrest, set out on the evening of October 31, 2009 to determine whether the Defendant was purposefully targeting his family in retaliation for their expressed views that had been critical of the State Police.  While traveling in the vicinity of the New City Line Bar & Restaurant in Bradford, Robert Cummins observed the Defendant following him in his police cruiser.

Robert purposefully made turns without using his turning signal and was pulled over by the Defendant.  Upon approaching Robert Cummins, Trooper Petrof stated that he could smell an odor of alcohol emanating from Robert and that Robert's eyes were bloodshot and glassy.  Plaintiff contends that, in anticipation of such an encounter, Robert had purposefully refrained from consuming any alcohol.  Robert was nonetheless subjected to field sobriety tests which, according to Trooper Petrof, Robert failed.  However, Robert was not arrested for DUI; instead Trooper Petrof issued only summary traffic citations.

Plaintiff subsequently filed this lawsuit claiming, pursuant to 42 U.S.C. §1983,[1] that Trooper Petrof violated her rights under the U.S. Constitution.  As the result of

---

[1]  Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

pretrial proceedings, four §1983 claims remain in the case.[2]  First, Plaintiff contends that Trooper Petrof violated her rights under the First Amendment by retaliating against her for the protected speech in which her two brothers engaged.  Second, Plaintiff claims her Fourth Amendment rights were violated when she was arrested by Trooper Petrof without probable cause to believe that she had been driving under the influence of alcohol.  Third, Plaintiff claims that her Fourth Amendment rights were violated by virtue of her blood draw.  Lastly, Plaintiff has raised a Fourth Amendment claim premised upon the allegedly malicious prosecution of the two traffic citations.  She seeks a judgment against Trooper Petrof in the amount of one-million dollars.

Defendant Petrof filed his motion for summary judgment on August 31, 2011. The motion has been fully briefed and argued and is ready for disposition.

## II.    STANDARD OF REVIEW

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir.2007).  The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982).  After examining the

---

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

[2] This Court's subject matter jurisdiction over the Plaintiff's claims is premised upon 28 U.S.C. §§ 1331 and 1343.

evidence of record, a court should grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law" and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (citation omitted).

### III.   DISCUSSION

Section 1983 does not create substantive rights but instead "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws."  *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).  To prevail under § 1983, a plaintiff must prove that she suffered the deprivation of a right secured by the United States Constitution or federal law by a person acting under color of state law.  *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995).  Because it is clear that Trooper Petrof was acting under color of state law at all relevant times, the only disputed element of Plaintiff's various §1983 claims is whether she has produced evidence sufficient to establish the violation of her federal rights.  We therefore examine the record in light of the applicable standard of review as it pertains to each of Plaintiff's constitutional claims.

6

A.

Plaintiff's first cause of action is a First Amendment claim premised upon alleged retaliation for the exercise of protected First Amendment rights.  Specifically, Plaintiff alleges that Trooper Petrof's actions were meant to punish the Plaintiff and her family for their decisions to engage in constitutionally-protected speech and to chill them from exercising those rights in the future.

In order to plead a retaliation claim under the First Amendment, a plaintiff must allege:  (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.  *Thomas v. Independence Twp.,* 463 F.3d 285, 296 (3d Cir.2006) (*citing Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir.2003)).

Here, Plaintiff has testified that she was, at times, critical of the State Police. However, to the extent Plaintiff is alleging retaliation premised upon her own protected First Amendment activity, the claim cannot survive summary judgment.  To be more specific, the record cannot support a finding that Plaintiff engaged in any constitutionally protected speech or conduct of which the Defendant was aware.  *See Ambrose v. Township of Robinson, Pa*., 303 F.3d 488, 493 (3d Cir.2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct."); *Baur v. Crum*, Civil No. 08–1222, 2012 WL 1071143 at *15 (E.D. Pa. Mar. 30, 2012)( "In order for Plaintiff to prevail [on her First Amendment retaliation claim], she must prove that Defendants were aware of her protected activity, otherwise there would be no causal connection.").  Indeed,

7

Plaintiff forthrightly acknowledged at oral argument that she could not prove protected activity on her part of which Trooper Petrof would have known.  (See Tr. of 12/5/11 oral argument [36] at p. 30.)

On the other hand, to the extent Plaintiff is alleging retaliation premised upon the protected activity of her family members, she runs into a different but equally insurmountable problem:  namely, the circumstances here do not permit her to prosecute the violation of her brothers' First Amendment rights.  "It is a well-established tenet of standing that a 'litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.'" *Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc*., 280 F.3d 278, 288 (3d Cir. 2002) (*quoting Powers v. Ohio*, 499 U.S. 400, 410 (1991)).

To be sure, "this 'prohibition is not invariable and our jurisprudence recognizes third-party standing under certain circumstances." *Interactive Media Entertainment and Gaming Ass'n, Inc. v. Attorney General of the United States*, 580 F.3d 113, 117-18 (3d Cir. 2009) (*quoting Pennsylvania Psychiatric Soc'y,* 280 F.3d at 288).  However, third-party standing requires the satisfaction of three preconditions:  "(1) the plaintiff must suffer injury; (2) the plaintiff and the third party must have a 'close relationship'; and (3) the third party must face some obstacles that prevent it from pursuing its own claims." *Pennsylvania Psychiatric Soc'y*, 280 F.3d at 289.  *See also Nasir v. Morgan*, 350 F.3d 366, 376 (3d Cir.2003).  *See also Interactive Media Entertainment and Gaming Ass'n., Inc.*, 580 F.3d at 118.  It then "remains for courts to balance these factors to determine if third-party standing is warranted."  *Pennsylvania Psychiatric Soc'y*, 280 F.3d at 289.

8

To the extent Plaintiff claims she was harassed by the Defendant in an effort to punish her brothers for engaging in protected speech and thereby dissuade them from criticizing the State Police, the alleged retaliation implicates the brothers' free speech rights, not Plaintiff's.  Therefore, Plaintiff can pursue such a claim only if she has third-party standing.

Here, the evidence of record is sufficient to establish the first two criteria for third-party standing:  *to wit*, Plaintiff has alleged an injury at the hands of the Defendant and her relationship to her brothers presumably makes her a suitable advocate of their rights.  However, the record is insufficient to satisfy the third criterion.

While, it is not entirely clear what constitutes a sufficient "obstacle" for purposes of establishing third-party standing, the case law of this circuit provides some guidance. Our circuit court of appeals has noted, for example, that "a legal or physical inability to bring suit" clearly qualifies as a sufficient obstacle, *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991) (*citing Hodel v. Irving*, 481 U.S. 704, 711-12 (1987) (Indian plaintiffs had standing to challenge statute which had allegedly constituted a "taking" of their decedents' right to pass property at death without just compensation)), although "the cases do not insist on an absolute impossibility of suit."  *Id*.  "At the other end of the spectrum," the court has said, "a practical disincentive to sue may suffice, although a mere disincentive makes for a less persuasive showing than an affirmative impediment." *Id*. (*citing Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1372-73 (1991) (holding that a litigant has third party standing to assert the rights of a juror who is unconstitutionally excluded from a venire) and *Singleton v. Wulff*, 428 U.S. 106, 115-18 (1976) (doctors had standing to raise claims that a statute restricting abortion funding violated the

9

constitutional rights of their patients)).

In *Amato v. Wilentz*, *supra*, the court held that the County of Essex, New Jersey

and its executive lacked third-party standing to assert a claim against a New Jersey

state judge who had allegedly violated the First Amendment rights of Warner Brothers

studio by denying the studio permission to shoot a film in the Essex County Courthouse

based on the judge's objection to certain scene content.  Among other things, the

Amato Court found that Warner Brothers faced no affirmative obstacle to filing suit on its

own behalf, even though it might have had only a limited practical incentive to do so.

952 F.2d at 751.

By contrast, in *Pennsylvania Psychiatric Soc'y, supra*, the court held that

psychiatrists had third-party standing to assert an ERISA action on behalf of their

patients against certain managed care organizations that were alleged to have

improperly refused to authorize necessary psychiatric treatment.  *See* 280 F.3d at 289-

90.  The court concluded that the psychiatrists had suffered economic harm due to the

defendants' conduct, they were in a sufficiently close relationship with their patients

such that they could effectively advocate their patients' claims, and the patients' fear of

stigmatization, coupled with their potential incapacity to pursue legal remedies,

"operate[d] as a powerful deterrent to bringing suit."  280 F.3d at 290.

In any event, because third-party standing is the exception rather than the rule, it

is the plaintiff's burden to establish third-party standing.  *Amato*, 952 F.2d at 750.  Here,

the record contains no evidence to support a finding that either Donald or Ronald

Cummins faced an obstacle preventing them from timely pursuing their own claims.  On

the contrary, if either Cummins brother could have established that there was a causal

link between his own constitutionally protected speech and the allegedly retaliatory conduct taken against the Plaintiff, then that brother could presumably have vindicated the alleged violation of his own free speech rights.

"[T]he key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" *Id*. (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir.2006)).  *See also Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir.2000); *Crawford-El v. Britton*, 523 U.S. 574, 589 n. 10 (1998) ("The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right.").  Because an alleged false arrest of a sibling might well be sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, it would appear that each of the Plaintiff's brothers had a colorable First Amendment retaliation claim.  The fact that neither brother chose to pursue such a claim and that such claims might now be time-barred is of no legal moment.  No facts have been presented by the Plaintiff which would warrant application of third-party standing relative to her First Amendment retaliation claim.  Accordingly, summary judgment will be entered in favor of Trooper Petrof on Plaintiff's first cause of action.

### B.

Plaintiff's second remaining cause of action asserts a Fourth Amendment violation premised upon a theory of false arrest.  "It is well-established that the Fourth Amendment 'prohibits a police officer from arresting a citizen except upon probable cause.'"  *Reedy v. Evanson*, 615 F.3d 197, 211 (3d Cir. 2010) (citations omitted).  Thus, a Fourth Amendment claim of false arrest will be established if the Plaintiff shows that

the arresting officer lacked probable cause to make the arrest.  *See Groman v. Twp. of Manalapan,* 47 F.3d 628, 634-35 (3d Cir. 1995).

Here, Defendant appears to be asserting, in part, that no arrest occurred and/or that it was voluntary based on the fact (according to the Defendant) that Plaintiff insisted upon being taken to the hospital for a blood draw.  Plaintiff denies that her consent to be transported to the hospital was voluntary, and she submits that Trooper Petrof determined to arrest her and take her to the hospital for a blood draw after talking to his supervisor by cell phone at the scene of the stop.  Having reviewed the record in its entirety, the Court finds that it cannot definitively resolve this issue as a matter of law because the record is insufficiently developed on the point.  Accordingly, the Court finds that there is a genuinely disputed issue of material fact relative to whether, and when, an arrest occurred in this case.

Alternatively, Defendant seeks summary judgment on the ground that, as a matter of law, Plaintiff cannot establish the absence of probable cause for her arrest.  Typically, the existence of probable cause in a § 1983 action is a question of fact for the jury.  *Wilson v. Russo*, 212 F.3d 781, 796 (3d Cir.2000) (*citing Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir.1997)); *Groman v. Township of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995).  In appropriate cases, however, a court may conclude that probable cause did exist as a matter of law if the evidence, viewed most favorably to the plaintiff, would not reasonably support a contrary finding.  *See Sherwood*, 113 F.3d at 401.

Probable cause exists "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offence has been or is being committed by the person being arrested."

*Orsatti v. N.J. State Police*, 71 F.3d 480, 482-83 (3d Cir.1995). While this requires more than a mere suspicion, it does not require a level of evidence as would support a conviction. *Reedy v. Evanson*, 615 F.3d at 211. Thus, this standard does not depend on the actual guilt or innocence of the arrestee; rather, it depends solely on whether the arresting officer had reasonable grounds to believe that the arrestee had committed the crime. *See Radich v. Goode*, 886 F.2d 1391, 1397 (3d Cir.1989). The test is an objective one based on the facts available to the officers "at the moment of arrest," *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994), rather than in hindsight. *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir.2005). Furthermore, whether the arresting officer acts in good faith or in bad faith in effectuating the arrest is irrelevant. *Whren v. United States*, 517 U.S. 806, 813–14 (1998).

Defendant contends that the video tape recorded by the Mobile Vehicle Recorder (MVR) fully captures the traffic stop and field sobriety tests and establishes as a matter of law that there was probable cause to believe the Plaintiff had been operating her vehicle under the influence of alcohol. Having viewed the videotape in its entirety (and noting that it lacks audio), the Court does not agree that it conclusively establishes probable cause for the Plaintiff's arrest.

What the videotape does confirm is that the Plaintiff was operating her vehicle at approximately 1:00 a.m. in the morning on October 31, 2009 (a Saturday), that she stopped for an extended period of time at a flashing yellow light, and that she threw a lighted cigarette butt out of her driver's- side window. The video also depicts her driver's-side tires briefly touching the center yellow line as she attempts to make a right-hand turn to pull off the roadway in compliance with the Defendant's directive.

13

The video further captures Plaintiff's initial interactions with Trooper Petrof and her conduct while he attempted to administer the various field sobriety tests.  Plaintiff can be seen from a profile view as Trooper Petrof attempts to administer the HGN test. No firm conclusions are necessarily established concerning Plaintiff's compliance (or non-compliance) with the Trooper's directions concerning the HGN test, particularly considering the lack of audio, nor does the video necessarily compel a conclusive judgment as to whether the Plaintiff had bloodshot and glassy eyes.

The video does depict Plaintiff wobbling as she attempts to perform the heel-to-toe test, but not so markedly that a jury would be compelled to find that the Plaintiff objectively appeared drunk.  Plaintiff is further seen in the video briefly attempting the one-legged stand without incident, except for the fact that she aborted her attempt prematurely.

Notably, Trooper Petrof's deposition testimony suggests that he based his probable cause finding on certain factors that are not susceptible to confirmation from the MVR tape.  These include his allegations that Plaintiff emitted a faint odor of alcohol and exhibited thick, slurred speech.

Other alleged observations factoring into Trooper Petrof's probable cause analysis -- such as Plaintiff's allegedly slow and sluggish movement, inability to open her car door, combativeness, and imbalance (as evidenced by her swaying and holding onto her vehicle) -- are theoretically within the scope of the MVR video, but the recording is subject to reasonably differing interpretations. Thus, the extent to which Plaintiff displayed objective signs of intoxication on the MVR tape is something the jurors will have to weigh for themselves in light of what is captured on the video.  In a

14

similar vein, Plaintiff's allegation about the incline of the surrounding pavement is not definitively borne out by the video footage, but the area is somewhat dimly lit from the viewer's perspective and it will be up to the fact finder to interpret this visual evidence more conclusively at time of trial.

When the record is construed most favorably to Plaintiff, it offers other evidence supportive of an issue of fact.  Plaintiff has testified, for example, that, upon being pulled over, she explained to Trooper Petrof the reason for her prolonged stop at the flashing light – namely, that the contents of her purse had spilled and was pausing while she retrieved the items.  Although the record suggests that the phlebotomist who drew Plaintiff's blood detected an odor of alcohol emanating from the Plaintiff, it is undisputed that the Plaintiff's blood alcohol content was zero, and Plaintiff maintains that she consumed no alcohol on the day in question, was not emitting any odor of alcohol, and did not have bloodshot or glassy eyes or other signs of intoxication.  Plaintiff's testimony in this regard is apparently supported by one of her employees who arrived at the scene to retrieve Plaintiff's dog from her car.  Plaintiff insists that, upon being informed by Trooper Petrof that he detected an odor of alcohol about her, she denied any such odor and informed Trooper Petrof that she had not had anything to drink. Finally, there is evidence to support a finding that Plaintiff's brother was pulled over by Trooper Petrof the very next night and subjected to field sobriety tests after having consumed no alcohol.

In light of all the foregoing, I do not view this case as one where the existence of probable cause can be determined as a matter of law.  If Plaintiff's evidence is to be believed, a jury could find that Plaintiff committed minor traffic violations but did not

otherwise exhibit the type of poor driving or other behavior indicative of intoxication.  A jury could further credit Plaintiff's theory that, once Trooper Petrof approached Plaintiff's vehicle, he recognized her and used the false excuse of smelling alcohol and observing other signs of intoxication as a pretext for subjecting Plaintiff to field sobriety tests. Moreover, a jury could find that, while Plaintiff failed to perform these tests properly, there were credible reasons for her failures and/or refusals that were not indicative of intoxication on any objectively reasonable basis.  Construing all the facts of record in the light most favorable to the Plaintiff, a jury could reasonably determine that probable cause for an arrest was lacking.  Accordingly, summary judgment is inappropriate as to this count.

C.

Plaintiff's third remaining cause of action is premised on an alleged violation of her Fourth Amendment rights as a result of what she claims was a forced blood draw. According to Plaintiff's complaint, this "compelled" blood draw constituted an "unwarranted physical intrusion of her person" which was "based upon false accusations by the Defendant that Plaintiff was under the influence of alcohol and/or drugs" and "was not supported by any probable cause and/or reasonable suspicion." (Complaint ¶¶59-60.)

Federal courts have recognized that blood draws are a form of seizure subject to constitutional considerations.  *See Schmerber v. California,* 384 U.S. 757, 767 (1966) (holding that blood testing procedures "plainly constitute searches of 'persons' ... within the meaning of [the Fourth] Amendment."); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616 (1989) ("We have long recognized that a compelled intrusion into the

16

body for blood to be analyzed for alcohol content must be deemed a Fourth Amendment search. ...  In light of our society's concern for the security of one's person, ... , it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable.") (internal citations and quotation marks omitted).

"As a general matter, 'warrantless searches ... are per se unreasonable under the Fourth Amendment.'"  *Reedy v. Evanson,* 615 F.3d 197, 225 (ellipsis and emphasis in the original) (quoting *United States v. Silveus,* 542 F.3d 993, 999 (3d Cir. 2008)). One exception to this rule, however, is "consent, which, if given voluntarily, authorizes a warrantless search."  *Id.* (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973)). Here, the Defendant essentially is arguing that Plaintiff cannot show a Fourth Amendment violation stemming from her blood draw because she consented to it either implicitly or explicitly.

The implied consent argument derives from 75 Pa. C.S.A. §1547, which provides (in relevant part) that:

> Any person who drives, operates or is in actual physical control of the movement of a vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath, blood or urine for the purpose of determining the alcoholic content of blood ... if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a vehicle ...  in violation of section ... 3802 (relating to driving under influence of alcohol or controlled substance) ...

75 Pa. C.S.A. §1547(a)(1).  As the foregoing language demonstrates, implied consent for a blood draw exists in cases where law enforcement has *reasonable grounds* to believe the driver has been (in this case) driving under the influence of alcohol.  This

17

"reasonable grounds" criterion has been interpreted by Pennsylvania courts as equating

to probable cause.  *See Commonwealth v. Thur,* 906 A.2d 552, 567 (Pa. Super. 2006)

(To administer a blood alcohol test, a police officer needs to have reasonable grounds

to believe that the suspect was driving under the influence of alcohol which, in the

context of BAC testing, means probable cause.) (*citing Commonwealth v. Aiello*, 675

A.2d 1278, 1280 (Pa. Super. 1996); 75 Pa.C.S.A. § 1547(a)(1)).  Because we have

found a genuinely disputed issue on this record as to whether probable cause existed to

support a reasonable objective belief that the Plaintiff had been driving under the

influence of alcohol, there is likewise an issue of fact as to whether she could have

impliedly consented to the blood draw.

Defendant also contends that Plaintiff expressly consented to the blood draw by

virtue of demanding or requesting that she be taken to the hospital for the blood test.

Defendant cites *Commonwealth v. Kelly,* 341 A.2d 141 (Pa. Super. 1975), wherein the

court ruled that the results of a breath test were admissible in a DUI case where the

accused had clearly consented to the test notwithstanding the fact that the arrest had

been unlawful in that it was premised upon a misdemeanor which occurred outside the

view of the officer.  The court in *Kelly* contrasted its case with the case of

*Commonwealth v. Modich,* 334 A.2d 717 (Pa. Super. 1975), wherein the court had ruled

that the accused's consent to testing was not truly consensual given the illegality of his

arrest, his reluctance to take the breath test, and his agreement to submit to the test

only after being advised by his attorney that refusal would result in a license

suspension.  Distinguishing *Modich* as a case involving "clear evidence of coercion," the

*Kelly* court concluded that it would not accept a finding of "implied coercion" based

18

solely on the fact that the accused knew he would face possible license suspension if he refused the breath test.

In this case, the record (at least as it presently stands) does not compel a finding, as a matter of law, that the Plaintiff voluntarily consented to the blood draw.  In particular, the record here is somewhat underdeveloped and contradictory concerning how the decision to obtain a blood test was arrived at.  Plaintiff contends that Trooper Petrof decided to take her to the hospital for the blood test after talking to his supervisor. She further claims that she consented to the blood test only under the duress of an illegal arrest.  On the other hand, Trooper Petrof claims that the Plaintiff demanded to be taken to the hospital for the test.  For reasons previously discussed, we have found an issue of fact as to if and when an arrest occurred and, if so, whether it was validly supported by probable cause.  The details as to how the alleged arrest unfolded, and when it occurred in relation to the decision to transport Plaintiff to the hospital remain as yet unclear.  Accordingly, we find that summary judgment is not appropriate relative to Plaintiff's claim premised upon the alleged forced blood draw.

D.

Finally, Plaintiff has asserted a § 1983 claim premised on a theory of malicious prosecution relative to her summary offenses.  It has been said that, "[t]o prevail in a Section 1983[ ] malicious prosecution action, a plaintiff must show:  (1) the defendant[ ] initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendant[ ] acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a

consequence of a legal proceeding." *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir.2005) (emphasis added and citation omitted).

In this case, Plaintiff concedes that she cannot establish the fifth element of her malicious prosecution claim, as she did not suffer any deprivation of liberty in connection with her traffic citations that would constitute a "seizure" for Fourth Amendment purposes. Accordingly, judgment will be entered in Trooper Petrof's favor relative to this claim.

E.

Trooper Petrof contends that, even if Plaintiff's claims do not fail on the merits as a matter of law, he is nevertheless entitled to summary judgment on the basis of qualified immunity. The qualified immunity doctrine shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, a court must consider, viewing the facts in the light most favorable to the plaintiff, (1) whether there was a violation of a constitutional right and (2) whether such a right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

At this stage of the proceedings, the court cannot determine whether Trooper Petrof is entitled to qualified immunity because this record gives rise to genuinely disputed material issues of fact, such as if and when an arrest occurred and, if so, whether the arrest was supported by probable cause. As we have explained, the record here could support differing conclusions as to whether a reasonable police officer would

have been justified in believing that the Plaintiff had been operating her vehicle under the influence of alcohol.  These differing conclusions in turn depend on the resolution of dispute issues of historical fact such as (among other things) whether the Plaintiff in fact emitted an odor of alcohol, whether she exhibited thick, slurred speech and/or bloodshot and glassy eyes, and whether the Plaintiff had credible reasons (other than intoxication) for stopping her vehicle at the yellow flashing light and failing or refusing various field tests.  We have also found that an issue of fact exists on this record as to whether the Plaintiff voluntarily consented to the blood draw.

Thus, the first prong of the qualified immunity analysis depends upon the resolution of factual issues making summary judgment on this ground inappropriate. *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir.2006) (holding that "when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury").  This ruling, however, is without prejudice, and the Defendant may raise a qualified immunity defense after the disputed issues of fact are resolved.

## IV.    CONCLUSION

Based upon the foregoing reasoning, the Defendant's motion for summary judgment will be granted with respect to Plaintiff's First Amendment retaliation claim as well as her Fourth Amendment malicious prosecution claim.  The motion will be denied with respect to Plaintiff's Fourth Amendment claims premised upon false arrest and a compelled blood draw.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DIANNE M. THOMPSON,                    )
                                       )
                Plaintiff,             )        Case No. 1:10-cv-123
                                       )
        v.                             )
                                       )
MATTHEW PETROF,                        )
                                       )
                Defendant.             )

**ORDER OF JUDGMENT**

AND NOW, to wit, this 11th Day of June, 2012, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS ORDERED that the Defendant's motion for summary judgment [25] shall be, and hereby is, GRANTED in part and DENIED in part as follows:

1.  Said motion is GRANTED insofar as it relates to Plaintiff's First Amendment retaliation claim as well as her Fourth Amendment malicious prosecution claim.  As to these claims, JUDGMENT shall be, and hereby is, entered in favor of the Defendant, Matthew Petrof, and against the Plaintiff, Dianne M. Thompson.

2.  Said motion shall be, and hereby is, DENIED insofar as it relates to Plaintiff's Fourth Amendment claims premised upon false arrest and a compelled blood draw.

IT IS SO ORDERED.

                                s/      Sean J. McLaughlin

                                        Sean J. McLaughlin
                                        United States District Judge

cc:     All counsel of record.

22