## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANNE M. THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10-cv-123-MRH |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW PETROF, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**Mark R. Hornak, United States District Judge**

This civil action arises out of an incident occurring in the early morning hours of October 31, 2009 which culminated in Defendant Matthew Petrof, a Pennsylvania State Trooper, arresting Plaintiff Dianne M. Thompson for driving under the influence of alcohol. Plaintiff commenced this action under 42 U.S.C. §1983 alleging, in relevant part, that Defendant violated her Fourth Amendment rights by arresting her and subjecting her to chemical testing without probable cause.[1]

The case was originally assigned to United States District Judge Sean J. McLaughlin. Following a four-day jury trial, Judge McLaughlin entered judgment in favor of the Defendant (ECF No. 59). The case was transferred to the undersigned on August 28, 2013.[2]

---

[1] The Court's subject matter jurisdiction is premised upon 28 U.S.C. §§ 1331 and 1343(a)(3).

[2] Pursuant to Fed. R. Civ. P. 63, the Court certifies that it has personally reviewed the pleadings, trial documents of record, exhibits, and the trial record bearing on the dispositions of these motions. The Court certifies that it is familiar with the record, and that the case may be completed without prejudice to the parties.

Currently pending in this case is the Plaintiff's motion to alter or amend the judgment and for a new trial (ECF No. 62). For the reasons that follow, Plaintiff's motion will be denied.[3]

## I.  **FACTUAL BACKGROUND**[4]

Plaintiff is the owner of the Corner Bar & Grill located in Bradford, Pennsylvania. (Trial Tr. vol. 6, p. 3 Oct. 24, 2012, ECF No. 75.)[5]  At all times relevant to this lawsuit, Plaintiff's brother, Don Cummins, was a member of the Bradford Township Board of Supervisors, and her other brother, Bob Cummins, was a local contractor. (Trial Tr. vol. 1, pp. 19-20, Oct. 22, 2012 ECF No. 70.)

On June 6, 2009 and again on August 21, 2009, the local Bradford newspaper published guest commentaries written, respectively, by Don and Bob Cummins. (Trial Tr. vol. 1, pp. 24-25, 35; Pl.'s Trial Ex. 26, 26A, 29.) Both commentaries were critical of the practices then being employed by the Pennsylvania State Police operating within the Bradford area. (Trial Tr. vol. 1, pp. 24-25, 35-36; Pl.'s Trial Ex. 26, 26A, 29.) Trooper Petrof was among the Pennsylvania State Police officers stationed in the Kane Barracks and assigned to the Bradford area during this time. (Trial Tr. vol. 1, pp. 25, 39-40.) It is undisputed that, as of October 31, 2009, Trooper Petrof was acquainted with the Plaintiff and her brothers, knew that Plaintiff owned the Corner Bar & Grill, and was also aware of the guest commentaries written by the Cummins brothers. (Trial Tr. vol. 1, pp. 19-20, 24-25, 31, 35-36, ECF No. 70; id. at pp. 64-66, ECF No. 70-1.)

---

[3] Also pending is Plaintiff's motion to list this matter for oral argument (ECF No. 66). Having carefully reviewed the Plaintiff's motion to alter or amend the judgment and for new trial and all documents of record and exhibits relevant thereto, the Court is of the view that oral argument will not materially assist its disposition of the Plaintiff's Rule 59 motion. Accordingly, Plaintiff's motion to list the within matter for oral argument will be denied.

[4] Except as otherwise indicated, the following events are undisputed based on the evidence presented at trial.

[5] All references are to the original pagination appearing internally within the referenced document rather to than the CM/ECF pagination appearing in the document's header.

At approximately 1:00 a.m. on the morning of October 31, 2009, Plaintiff was operating her vehicle after having left the Corner Bar & Grill. (Trial Tr. vol. 1, p. 3; Trial Tr. vol. 2, p. 49, Oct. 23, 2012, ECF No. 71; Trial Tr. vol. 6, pp. 4-7 Oct. 24, 2012, ECF No. 75.) Plaintiff had not consumed any alcoholic beverages throughout the day, there was no alcohol present in her vehicle, and her blood alcohol content was zero. (Trial Tr. vol. 1, p. 13; vol. 6, pp. 5-6, 12, 25.)

As the Plaintiff drove home, she was observed by Trooper Petrof stopping at a yellow flashing light for a prolonged period of time and tossing a lighted cigarette butt out of her car window. (Trial Tr. vol. 1, pp. 4, 7, 9; Trial Tr. vol. 6, pp. 9-10; Pl.'s Trial Ex. 9.) Based on these observations, Trooper Petrof signaled for Plaintiff to pull over, unaware at first that Plaintiff was the driver of the vehicle. (Trial Tr. vol. 1, pp. 16-19, 21-22; vol. 6, p. 11; Pl.'s Trial Ex. 15, 15A.)

Upon approaching the Plaintiff's car, Trooper Petrof stated that the Plaintiff was emitting a slight odor of alcohol and that she appeared to have bloodshot and glassy eyes. (Trial Tr. vol. 1, pp. 20-21, 38; vol. 6, pp. 11-13.) Plaintiff contends she denied smelling of alcohol or having consumed any alcohol that day. (Trial Tr. vol. 6, pp. 11-12.)

Trooper Petrof ordered Plaintiff out of the car and directed her to perform several field sobriety tests – namely, the Horizontal Gaze Nystagmus, the heel-to-toe walk, and the one-legged stand, each of which Plaintiff either refused to perform or failed to complete successfully. (Trial Tr. vol. 1, pp. 10-11, 28-30, 35, 45, ECF No. 70; id. at pp. 67-69, ECF. No. 70-1; Trial Tr. vol. 2, pp. 31, 34, 50, ECF No. 71; Trial Tr. vol. 6, pp. 14-15, ECF No. 75; Pl.'s Trial Ex. 9.) Trooper Petrof then attempted to administer a Portable Breathalyzer Test (PBT), but Plaintiff refused to comply because she did not trust that Defendant would administer the test accurately. (Trial Tr. vol. 2, p. 33, ECF No. 71; id. at p. 51, ECF No. 71-1; Trial Tr. vol. 6, pp. 15-16.)

Plaintiff was subsequently handcuffed and taken to the Bradford Regional Medical Center for a blood draw. (Trial Tr. vol. 1, pp. 40, 50; Trial Tr. vol. 2, pp. 39, 51-52; Trial Tr. vol. 6, p. 19.) After the results came back negative for alcohol, Plaintiff was re-handcuffed, transported back to her vehicle, and released. (Trial Tr. vol. 1, pp. 44, 47, 50, ECF No. 70; id. at pp. 53, 56, ECF No. 70-1; Trial Tr. vol. 2, pp. 40-41, 53.)

Several days later, Trooper Petrof issued citations against Plaintiff for remaining stationary too long at the yellow flashing light and for littering. (Trial. Tr. vol. 1, pp. 16-18; Pl.'s Trial Ex. 15, 15A.) The matter eventually proceeded to a summary trial before a district justice, and Plaintiff was found not guilty of the summary offenses. (Trial Tr. vol. 1, pp. 16-18.)

## II.    PROCEDURAL HISTORY

This lawsuit was commenced on May 19, 2010 with the filing of Plaintiff's complaint (ECF No. 1), which alleged numerous causes of action under 42 U.S.C. §1983.[6] At the conclusion of pretrial proceedings, Plaintiff's only remaining claims were her Fourth Amendment claims premised upon her allegedly unlawful arrest and blood draw. At trial, the central issues in dispute were: (1) whether the arrest and blood draw were supported by probable cause and (2) whether Plaintiff had consented to the arrest and chemical testing.

The Defendant's theory at trial was that Plaintiff had attempted to orchestrate an unlawful arrest because of the animosity which she and her family members felt with regard to the State Police. Trooper Petrof testified that Plaintiff had initially exhibited numerous signs of impairment, *to wit:* she was emitting a "slight" or faint" odor of alcohol, she exhibited glassy

---

[6] Section 1983 provides a private right of action as against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…

42 U.S.C. §1983.

eyes and thick speech, she was non-responsive when asked if she had been drinking alcohol, and she appeared either unable or unwilling to properly perform the standard field sobriety tests. (Trial Tr. vol. 1, pp. 27-31, 36-38, 66-68; Trial Tr. vol. 2, pp. 33-34, 49-50, 61-62; Pl.'s Ex. 6.) Despite these signs, Trooper Petrof testified that he had doubts about whether Plaintiff was legally drunk; he thought she might be deliberately failing to perform the field sobriety tests, but he could not be sure without the benefit of chemical testing. (Trial Tr. vol. 1, pp. 62-64, 69-70; vol. 2, pp. 31-34, 69-70.) Trooper Petrof then attempted to administer the PBT but Plaintiff refused and indicated that she did not trust him, considered him a "liar," and wanted to be taken for a blood test. (Trial Tr. vol. 1, pp. 30, 62; vol. 2, pp. 33-34, 51-52.) At that point, Trooper Petrof sent Plaintiff back to her car while he contacted his supervising officer as he was required to do when dealing with individuals who were connected in some way to the adverse news articles. (Trial Tr. vol. 1, pp. 11-12, 30-32, 38-40.) After speaking with his supervising officer and confirming that he would transport the Plaintiff for chemical testing, Trooper Petrof awaited transport assistance from the Bradford city police while Plaintiff continued to wait in her car. (Trial Tr. vol. 1, pp. 12, 14, 40; Trial Tr. vol. 2, p. 60.) Upon the arrival of the Bradford city police cruiser, Plaintiff was handcuffed, placed in that cruiser, and taken to the Bradford Regional Medical Center, where she underwent a blood test. (Trial Tr. vol. 2, pp. 59-60, 70.)

Concerning the issue of consent, Trooper Petrof posited that Plaintiff had essentially engineered her own arrest by pretending to be intoxicated and/or by insisting that she be taken to the hospital for chemical testing. (Trial Tr. vol. 1, pp. 62-63, 69; Trial Tr. vol. 2, p. 29.) Trooper Petrof variously described Plaintiff's words as "requesting" or "demanding" that she be taken to the hospital. (Trial Tr. vol. 1 pp. 62, 69; Trial Tr. vol. 2, pp. 51-52.)

Plaintiff's theory at trial was that Trooper Petrof is an overly zealous officer who falsely claimed to have detected an odor of alcohol in an attempt to manufacture grounds for an arrest that was not supported by probable cause. Plaintiff denied consuming or coming into contact with alcohol at any point during the day leading up to her arrest, and she also denied exhibiting signs of intoxication. (Trial Tr. vol. 6, pp. 5-6, 12, 27-28.) She testified that, upon being pulled over, she attempted to explain to Trooper Petrof that the reason for her delay at the yellow flashing light was that her dog had knocked over the contents of her purse onto the floor of her car and she had paused at the light to pick them up; however, Trooper Petrof was not interested in the explanation. (Id. at pp. 9, 12-13, 51.) Plaintiff further testified that, when confronted by Trooper Petrof about an alleged odor of alcohol, she adamantly denied having consumed any alcohol beverages and further denied that she could be emitting any odor of alcohol. (Id. at 11-13.) At that point, Plaintiff claims, Trooper Petrof replied that she was either drunk or on drugs, which was untrue. (Id. at 13.)

Plaintiff explained that she could not perform the HGN properly because Trooper Petrof had failed to demonstrate the test clearly. (Trial Tr. vol. 6, pp. 14-15.) She stated that she had difficulty with the walk-and-turn because of the fact that she was required to attempt that test on an inclined surface. (Id. at 15.) She claimed that she did not complete the one-legged stand because she perceived that Trooper Petrof was terminating the test and did not want her to continue. (Id. at 15.) Plaintiff testified that she refused the PBT because she did not trust that Trooper Petrof would administer the test accurately. (Id. at 16.) She claimed that she eventually submitted to the blood draw only because she believed that a refusal would result in a one-year license suspension. Plaintiff described the incident as follows:

> When Trooper Petrof first asked me to take the test and I refused, he went on to explain to me how important the test was, and I listened to what he had to

say. And I again refused the test. I said I'm not taking that test. He came at me with the test again, and I said no. He went on to talk to me about the test. I think the other officer in the patrol car [Trooper Palmer] ... had come out of the car, he came up to where Officer Petrof and I were.

Q.    How close did Trooper Palmer get to you, I mean the jury can look at it on the film?

A.    I think he was about six feet away at that point, maybe closer, four to six feet away.

***

A.    So, again, I had refused to take the PBT test. Four times he came at me with that and I had kept backing up, saying to him I'm not going to take that test. I do not want to take that test. It finally ended up that I was against the back of the car and he was still shoving this test in my face. And I went like this (indicating), I said I'm not taking that test.

THE COURT: I'm sorry, you say you went like what?

THE WITNESS: I made a motion with my hands like this (indicating). That I just wasn't going to do it. But at the same time I didn't want to lose my license for a year. So I had asked him questions about losing my license for a year. If I didn't take that test, would I lose my license. And this kind of conversation went back and forth for a little bit. How important the test was, I should take it, and I'm not going to take it. And he just kept getting angrier and angrier. Finally I just stood at the back of the car until he was finished. And then my concern at that point was that I not lose my license for a year. I didn't understand at that time that you could take a PBT test, and then you had to go and get a blood test, I had never been through it before, I thought it was one or the other. Either you take the machine that you blow in or you go get a blood test. Apparently I was wrong, you could blow into the machine, and then you go get a blood test. I didn't have a clue about that. So after this went on for quite sometime [sic] at the back of the car, I said, officer Petrof, I am not going to lose my license over this. He said to me that I could go to the hospital and get a blood test. And I said if that was my only option, the only way that I could prove that I wasn't drinking, I would go to the hospital and get a blood test. That all took place at the back of my car.

(Trial Tr. vol. 6, pp. 17-18.)

Plaintiff claims she was then directed by Trooper Petrof to return to her vehicle, where she remained for approximately 12 or 15 minutes and made arrangements for a friend to come and retrieve her dog. (Trial Tr. vol. 6, pp. 18-19.) A Bradford city police cruiser subsequently

arrived, and Plaintiff was then handcuffed by Trooper Petrof, placed in the city police cruiser, and taken to the hospital for the blood test. (Id. at 19.)

Concerning the issue of consent, Plaintiff disputes that she demanded to go to the hospital or that she asked to be arrested. (Trial Tr. vol. 6, pp. 20-21, 50-51.) She testified that she requested a blood draw because she felt that it was her only option as far as proving that she did not have any alcohol in her system. (Id.) She described her exchange with Trooper Petrof as follows:

> ... At the end of, I don't know how many minutes, four minutes, maybe more, of him trying to convince me strongly to take this PBT test, I asked him again if it was my only option. I didn't want to lose my driver's license. And he said then I had the opportunity to go and get a blood test. And I said that's what I'll have to do, I have no other choice, I'll have to go get a blood test.

Trial Tr. vol. 6, pp. 50-51.) Describing her emotions at that point, Plaintiff stated, "I felt pinned against the back of my car like there was nowhere for me to go. [Trooper Petrof] was so mad at me for not taking that PBT test. He tried four times to shove it at me. I was upset to say the least... I went from mad to scared to intimidated – it just ran the gambit [sic]." (Id. at 21.) Plaintiff further stated that she felt like she was "under [Trooper Petrof's] control, I'm stuck here with this man who is lying about my condition, that I'm driving with alcohol on my breath." (Id. at 52.) She considered the exchange over the PBT "the absolute worst part" of the incident: "This man would not take no for an answer. You could see it in the back of the car – I had nowhere else to go." (Id.) She described the videotape as depicting Officer Palmer approaching the two of them at that point "because he obviously sees that there's some stress there, there's something wrong there." (Id.)

Ultimately, the jury was asked to consider the following issues concerning liability: (i) whether Plaintiff had proved by a preponderance of the evidence that Trooper Petrof lacked probable cause to arrest her for driving under the influence of alcohol and (ii) whether Trooper

Petrof had proved by a preponderance of the evidence that Plaintiff consented to her arrest, either by feigning intoxication or by demanding that she be taken to the hospital for a blood test. To that end, special interrogatories were submitted to the jury.

During the course of their deliberations, the jury submitted the following question for clarification: "At what point during the incident on Oct 31, 2009 is the plaintiff considered under arrest?" [ECF No. 56.] Judge McLaughlin instructed the jury, in relevant part, as follows:

> I'm going to answer that for you now in this fashion. In this case the plaintiff claims that the defendant arrested her without probable cause. The defendant contends that the arrest occurred when the plaintiff was handcuffed in the cruiser. Thus, there is no dispute that plaintiff was under arrest at least as of the time that she was handcuffed and placed in the police cruiser. The plaintiff contends that while the initial stop and preliminary investigation were justified, at some point prior to the cuffing of the plaintiff and placing her in the cruiser, an arrest occurred which required probable cause. In deciding whether the plaintiff was arrested at some point prior to having been handcuffed and placed in the cruiser, you should consider, among other factors, the following circumstances. The length of the interaction. Whether the defendant was diligent in pursuing the investigation, or whether he caused undue delay that lengthened the seizure. Whether the defendant pointed a gun at the plaintiff. Whether the defendant physically touched the plaintiff. Whether the defendant moved the plaintiff to a police facility. And whether the defendant stated that he was placing the plaintiff under arrest.

(Trial Tr. vol. 5, 38:3-23, Oct. 25, 2012, ECF No. 74.)

The jury subsequently returned the verdict in the following form:

1. Has the Plaintiff proven by a preponderance of the evidence that there was no

   probable cause for her arrest?

   Yes __X__                    No _____

   (If you answered "yes" to this question, please proceed to Question #2. If you answered "no" to this question, please skip the remaining questions, sign and date this verdict slip, and notify my courtroom staff that you have reached a verdict.)

2.  Has Trooper Petrof proved by a preponderance of the evidence that the

    Plaintiff consented to her arrest by virtue of feigning intoxication?

    Yes _____                              No __X__

      (If you answered "yes" to this question, please skip the remaining
questions, sign and date this verdict slip, and notify my courtroom staff that you
have reached a verdict. If you answered "no" to this question, please proceed to
Question #3.)

3.  Has Trooper Petrof proved by a preponderance of the evidence that the

    Plaintiff voluntarily consented to her arrest by virtue of demanding to be

    transported to the Bradford Regional Medical Center for a blood draw?

    Yes __X__                              No _____

      (If you answered "yes" to this question, please skip the remaining
questions, sign and date this verdict slip, and notify my courtroom staff that you
have reached a verdict. If you answered "no" to this question, please proceed to
Question #4.)

4.  Please state below the amount that will fairly compensate the Plaintiff for any

    injury she actually sustained as a result of the Defendant's conduct. If you

    find that Plaintiff has failed to prove, by a preponderance of the evidence, that

    she sustained an injury as the result of the Defendant's conduct, please enter

    the amount of one dollar ($1.00) below.

    ---------$1.00-------

(Please proceed to Question #5.)

5.  Has the Plaintiff proved by a preponderance of the evidence that Trooper

    Petrof acted willfully or maliciously in violating her Fourth Amendment

    rights?

Yes _____                                    No __X__

(If you answered "yes" to this question, please proceed to Question #6. If you answered "no" to this question, please skip the remaining question, sign and date this verdict slip, and notify my courtroom staff that you have completed your deliberations.)

6. Please enter below the amount of punitive damages, if any, that you find appropriate.

------- None -------

(Verdict Slip, Oct. 25, 2012, ECF No. 58.)

After the jury returned its verdict, counsel met with Judge McLaughlin in chambers, and the following discussion ensued:

THE COURT: Let me show both of you the form. I guess the point I'm making is clearly by virtue of the jury's finding on question number three, they were instructed "if you answered 'yes' to this question, please skip the remaining questions, sign and date this verdict slip, and notify my courtroom staff that you have reached a verdict." They erroneously proceeded to question four and put a $1.00 in. The upshot being that after question three, that was the end of the case, that functionally is a defense verdict. I guess my question is procedural, it's an inconsistent verdict on liability, they clearly found that the defendant was not liable and erroneously put a dollar down.

MR. WILLIG: Correct.

THE COURT: What do I do about it?

MR. HENRY: I don't know. Would I be remiss in asking for a copy of that?

THE COURT: No, you wouldn't be remiss at all. I'll have the verdict slip copied.

MR. HENRY: So I could have it front of me to try to answer your question. ...

THE COURT: Let me put it this way, I'm not asking you, I don't want you to make any snap decisions. I'm simply throwing it out there for anybody's consideration. The original will be docketed, and let's see where we go from there.

MR. WILLIG: Do you want us to file some kind of motions or something, is that what you're saying?

THE COURT: I don't know. Frankly, I don't even know if anything has to be done. By virtue of question three, it's a defense verdict, with them proceeding erroneously to question four. I guess my point is this. It may seem somewhat nitpicking. Trooper Petrof, by virtue of question three, it seems to me, doesn't owe a dollar.

MR. HENRY: I understand the logic of it. At the same time, I don't want to give up my legal position just yet.

THE COURT: I'm not suggesting you have to. My major point was simply to confirm that both of you were award of the anomaly there.

MR. HENRY: I'm definitely aware of it.

THE COURT: I figured you would be. So there we go. Thank you, counsel.

(Trial Tr. vol. 5, 41:25-43:17, Oct. 25, 2012, ECF No. 74). Consistent with his interpretation of the verdict slip, Judge McLaughlin entered judgment in favor of Defendant and against Plaintiff (ECF No. 59).

On November 23, 2012, Plaintiff filed the pending motion pursuant to Rule 59 of the Federal Rules of Civil Procedure (ECF No. 62). In her motion, Plaintiff requests that the Court amend the judgment in favor of Defendant Petrof, acknowledge Plaintiff to be the "prevailing party," and accord the Plaintiff fourteen (14) days in which to file a petition for counsel fees. Alternatively, Plaintiff requests that the Court award her a new trial. On January 7, 2013, Defendant filed his response disputing Plaintiff's entitlement to the requested relief (ECF No. 65).

The matter was transferred to the undersigned on August 28, 2013 (ECF No. 67), following Judge McLaughlin's departure from the bench. On September 13, 2013, this Court entered a memorandum order staying the case pending the parties' submission of supplemental memoranda containing appropriate citations to the trial record (ECF No. 69). Plaintiff filed her

supplemental memorandum on October 15, 2013 (ECF No. 78). Defendant filed his supplemental memorandum on November 25, 2013 (ECF No. 80). The issues have been adequately joined and are ripe for disposition.

## III.  DISCUSSION

### A.  Plaintiff's Motion to Alter or Amend the Judgment

Plaintiff has moved this Court to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Generally, motions under Rule 59(e) must rely on one of the following three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice. *Wiest v. Lynch*, 710 F.3d 121, 128 (3d Cir. 2013); *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (*per curiam*) (citation omitted). Because the first two grounds are clearly not implicated here, Plaintiff can obtain relief, if at all, only by demonstrating a need to correct a clear error or prevent manifest injustice. To that end, Plaintiff argues that the Court was compelled to reconcile the jury's inconsistent verdict by construing it as an award of $1.00 in her favor.

"A 'trial court is under a constitutional mandate to search for a view of the case that makes the jury's answers consistent.'" *McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750, 764 (3d Cir. 1990) (internal quotation marks and citation omitted). Accordingly, "a verdict must be molded consistently with a jury's answers to special interrogatories when there is any view of the case which reconciles the various answers." *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1159 (3d Cir.1989).

In this case, the inconsistency in the verdict stems from the jury's answers to Special Interrogatories Nos. 3 and 4. After finding that there was no probable cause for Plaintiff's arrest and that the Plaintiff had not consented to her arrest by feigning intoxication, the jury next found,

13

in response to Special Interrogatory No. 3, that Plaintiff *did* consent to her arrest by demanding that she be taken to the hospital for a blood draw. At this point, according to the instructions on the verdict form, the jury was supposed to cease its deliberations, sign and date the form, and notify the judge's staff that they had reached a verdict. Instead of doing so, however, the jury went on to answer Special Interrogatory No. 4, which directed it to "state below the amount that will fairly compensate the Plaintiff for any injury she actually sustained as a result of the Defendant's conduct. If you find that Plaintiff has failed to prove, by a preponderance of the evidence, that she sustained an injury as the result of the Defendant's conduct, please enter the amount of one dollar ($1.00) below." (Verdict form [ECF No. 58] at p. 2.) In response to this directive, the jury entered one dollar. Judge McLaughlin resolved the foregoing inconsistency by accepting the jury's finding of consent and essentially disregarding the jury's answer to Special Interrogatory No. 4 as surplusage. Based on this interpretation of the verdict form, Judge McLaughlin entered judgment in favor of the Defendant.

Plaintiff contends that it was incumbent upon Judge McLaughlin to try and resolve the inconsistencies in the jury's responses by giving effect to all of the jury's answers. She posits that Judge McLaughlin could have, and should have, done so by interpreting the jury's verdict as an award of $1.00 in her favor. Plaintiff's theory is that the jury implicitly found she had been unlawfully arrested *prior* to the point when she consented to being transported to the hospital for a blood draw. As Plaintiff sees it, "[t]he jury must have concluded that [her] demand to be taken to the hospital for a blood test was analogous to where an individual voluntarily appears at police headquarters to convince officials of his innocence." (Pl.'s Suppl. Mem. [ECF No. 78] at 10.) Thus, Plaintiff concludes:

> **the jury did not regard [her] subsequent consent as a justification for her earlier unlawful seizure. In other words, the unlawful arrest for which they**

14

**awarded the Plaintiff nominal damages was not annulled, nullified, or cancelled by her consent**. The jury concluded merely that the Plaintiff's consent *cured* the unlawful seizure/arrest which it had found the Defendant to have made. The jury then proceeded to answer all damage questions consistent with this understanding.

(Id. (emphasis in the original).)

Although Plaintiff's argument represents one *perhaps* plausible theory of the jury's intent,[7] it is not the only plausible theory. It is considerably more reasonable to conclude, consistent with Judge McLaughlin's view, that the jury understood its finding of consent as a complete defense to the false arrest claim and intended its entry of $1.00 in response to Question No. 4 as merely an indication, consistent with its defense verdict, that "Plaintiff ha[d] failed to prove ... an injury as the result of the Defendant's conduct." (Verdict Form [ECF No. 58] at 2.)[8]

Accordingly, Judge McLaughlin's treatment of the jury's answers to Special Interrogatories Nos. 4 through 6 as mere surplusage was not clear error. As one federal court has observed, "[t]here is precedent for disregarding answers to special interrogatories which jurors were instructed not to address based on an apparently conflicting answer to a prior question which should have terminated deliberations." *Lavin v. Tony DePaul & Son,* No. 93-1502, 1995 WL 765720 * 2 (E.D. Pa. Dec. 29, 1995) (*citing Kavanaugh v. Greenlee Tool Co.,* 944 F.2d 7, 10 (1st Cir.1991); *Floyd v. Laws,* 929 F.2d 1390, 1398 (9th Cir.1991); *White v. Grinfas,* 809 F.2d 1157, 1161 (5th Cir.1987)). *See also Copeland v. L. Capone Trucking, Inc.,* Civ. A. No. 89-

---

[7] In the Court's estimation, this characterization (which requires several layers of inference) is giving the Plaintiff a rather big benefit of the doubt, since it would appear to also run counter to the Court's specific instructions to the jury on the role of consent. (*See* ECF No. 74 at 9-12.)

[8] Judge McLaughlin's interpretation of the verdict slip is persuasive in view of the jury's responses to Special Interrogatories Nos. 5 and 6. The former asked whether Plaintiff had proven that Trooper Petrof "acted willfully or maliciously in violating her Fourth Amendment rights" (Verdict Form [ECF No. 58] at 2), and the jury answered "no." (Id.) Although the verdict form expressly instructed the jury that it should cease further deliberations if it answered Question No. 5 in the negative, the jury went on to address Special Interrogatory No. 6 (indicating that the "appropriate" amount of punitive damages to be awarded was "none") – once again disregarding the verdict form's clear instructions. (Id. at 2-3.) This pretty strongly suggests that the jury's response to Question No. 4 (and to Questions No. 5 and No. 6) was the product of a mistaken assumption that all questions on the form required an answer.

1350, 1991 WL 25692 *2 (E.D. Pa. Feb. 25, 1991) (where "jury's only mistake ... was in answering a question it need not have answered," the court would correct the jury's error "by merely disregarding the answer which should not have been given in the first place."). *But see Lavin, supra,* at *2 ("[P]articularly when there is reason to doubt the meaning of a jury's answers, it is not altogether fair to assume that its findings regarding liability are correct and those regarding an award of damages are not.") (citing *Hatfield v. Seaboard Air Line Railroad Co.,* 396 F.2d 721, 724 (5th Cir. 1968)).

In essence, Plaintiff's argument as to the jury's intended findings is an indirect challenge to the form of the verdict slip. Plaintiff posits that the jury meant to find that she had first been unlawfully seized by virtue of an arrest without probable cause and that she *subsequently consented* to the arrest. Plaintiff further posits that such a finding was permitted by the manner in which Judge McLaughlin instructed the jury in response to its question, "[a]t what point during the incident ... is the plaintiff considered under arrest?" (ECF No. 56.) Even assuming, however, that the Plaintiff is correct about her characterization of Judge McLaughlin's instruction on "arrest" and the jury's intent, the fact remains that the findings she now advocates were not permitted by the form of the verdict that the jury was given. On the contrary, the verdict slip expressly admonished the jury at Question No. 3 that, if they found Plaintiff voluntarily consented to her arrest, they had to then terminate their deliberations without proceeding to the questions relating to damages. The wording of Question No. 3 also required them to find a consensual arrest only if the consent was "voluntary" – meaning that it could not have been the product of duress or coercion. (*See* Final Instructions to the Jury [ECF No. 55] at 7-8 (stating that, "[T]o be effective, consent must be freely and voluntarily given. The question as to whether a consent was in fact 'voluntary' or was a product of duress or coercion is a

16

question of fact to be determined from the totality of the circumstances," including, among other things, consideration of "law enforcement officials' use of any inherently coercive tactics.").)

Thus, even if Judge McLaughlin's subsequent instruction on arrest suggested that the jury could find an unlawful arrest precedent to consent (which the Court does not conclude), the jury form was never amended to permit such a finding. At all times, the verdict slip functionally permitted only a finding of consent that was (a) "voluntary" and (b) dispositive of the Plaintiff's Fourth Amendment claim.

Importantly, Plaintiff never requested that the form be altered to permit the jury to make the findings that she now urges this Court to adopt.[9] Consequently, to the extent that Plaintiff's Rule 59(e) motion is a challenge to the form of the verdict, it comes too late and is waived. *See* Fed. R. Civ. P. 49(a)(3) ("A party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, before the jury retires, the party demands its submission to the jury."). When a party fails to demand that an issue of fact be submitted to the jury, "the court may make a finding on the issue" but, "[i]f the court makes no finding, it is considered to have made a finding consistent with its judgment on the special verdict." *Id.* In sum, by virtue of his entry of a defense verdict, Judge McLaughlin implicitly found that there was no unlawful arrest *precedent to Plaintiff's consent* to be taken for a blood draw. Because there was ample evidence in the record to support this finding, Plaintiff cannot establish that it was clearly erroneous.

---

[9] In fact, in discussing the manner in which the jury charge and verdict slip would be constructed, Plaintiff's counsel agreed that Plaintiff's arrest occurred when she was handcuffed in order to be transported for a blood draw. (Trial Tr. vol. 6, pp. 32:21-33:1, Oct. 24, 2012 [ECF No. 75].) In light of this concession, any consent by the Plaintiff (in the form of a demand for a blood draw) would necessarily have preceded her arrest and would therefore necessarily operate as an affirmative defense. It appears that the Court prepared its verdict slip accordingly. Plaintiff's counsel subsequently requested only one change to the Court's proposed verdict form, and that requested alteration – which the Court adopted -- did not concern Plaintiff's theory that she had been unlawfully arrested *prior* to giving voluntary consent. (*See* Trial Tr. Vol. 4, pp. 2-3, Oct. 25, 2012 [ECF No.73].)

Plaintiff contends that no waiver could have occurred for purposes of Rule 49(a)(3) based on the post-verdict discussion which Judge McLaughlin had with both counsel. This line of argument is unpersuasive. During the post-verdict discussion, Judge McLaughlin made a point to bring the anomaly in the verdict slip to counsels' attention. He twice expressed his view that the jury had erroneously proceeded to Special Interrogatory No. 4 and that its answer to Special Interrogatory No. 3 functionally ended the case and represented a defense verdict. (*See* Trial Tr. vol. 5, 42:6-8, Oct. 24, 2012, ECF No. 74; *see also id.* at 42:23 and 43:5-9.) Thus, Plaintiff's counsel was on notice that the Court intended to enter judgment for the Defendant and that, in doing so, the Court would be making an implicit finding that Plaintiff's voluntary consent had precluded any possibility of a false arrest. Although Judge McLaughlin did not insist upon the jury's return for clarification or further deliberation, he did not preclude either counsel from requesting the jury's return and in fact invited counsels' suggestions as to how the matter should be handled from a procedural standpoint. (Id. at 42:8-13.) At no point did the Court purport to advise either attorney as to the manner in which they should advocate their respective clients' rights. On the contrary, Judge McLaughlin frankly admitted that he was uncertain as to how the inconsistency should be handled. (*Id.* at 42:13, 43:5-6.) Accordingly, in the context of his post-verdict discussion with counsel, Judge McLaughlin's admonition against "snap decisions" cannot reasonably be understood as an invitation for the attorneys to defer arguments or rights that are otherwise required to be asserted within a particular time frame under the Federal Rules of Civil Procure. Rather, the comment is more reasonably understood merely as an admonition by Judge McLaughlin that Plaintiff's counsel should not reflexively agree with the Court's interpretation of the verdict slip.

In sum, Judge McLaughlin was not compelled, as a matter of law, to construe the jury's special interrogatory answers as a verdict in Plaintiff's favor. Moreover and in addition to that, Plaintiff's implicit challenge to the form of the verdict slip is waived. Because no clear error has been demonstrated, Plaintiff is not entitled to relief under Rule 59(e).

## B.    Plaintiff's Motion, in the Alternative, For a New Trial

Plaintiff also argues, in the alternative, for a new trial. Rule 59(a) permits a federal district court to grant a new trial "on all or some of the issues... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Grounds for a new trial may exist where, for example, the jury's verdict is against the clear weight of the evidence and a new trial must be granted to prevent a "miscarriage of justice." *University of Pittsburgh of Commw. Sys. of Higher Educ. v. Varian Med. Sys., Inc.,* 877 F. Supp. 2d 294, 304 (W.D. Pa. 2012) (citations omitted), *aff'd in part, rev'd in non-relevant part,* --- F. App'x ----, 2014 WL 1387144 (Fed. Cir. April 10, 2014). The decision to grant or deny a new trial is within the sound discretion of the district court. *Id. (citing Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36 (1980); *Radwan v. Carteret Bd. of Educ.,* 62 F. App'x 34, 37 (3d Cir. 2003)).

Plaintiff asserts that the jury's finding in response to Special Interrogatory No. 3 was against the weight of the evidence, warranting a new trial. According to Plaintiff, once she had been seized (i.e., unlawfully arrested), her willingness to submit to a blood test could not, as a matter of law, constitute consent. Consequently, Plaintiff argues, the jury was not at liberty to conclude that her demand for a blood test constituted consent.[10]

---

[10]Although Plaintiff contends that the jury's verdict is against the weight of the evidence "*as a matter of law*," she has framed her argument as grounds for a new trial pursuant to Rule 59(a)(1)(A), rather than as a "sufficiency-of-the-evidence" challenge as might warrant entry of judgment in her favor as a matter of law pursuant to Rule 50(b). To the extent that Plaintiff is implicitly asserting a Rule 50(b) challenge, that motion is denied inasmuch as Plaintiff

"[W]hen a court evaluates a challenge to the weight of the evidence it does not view the evidence in the light most favorable to the verdict winner, but instead exercises its own judgment in assessing the evidence." *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 309 n.18 (3d Cir. 2007) (citing authority). "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Id.* (*quoting Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir.1991)) (alteration in the original). *See also Tokash v. Foxco Ins. Management Services, Inc.*, 548 F. App'x 797, 800 (3d Cir. 2013) ("A district court should not grant a new trial unless there is a 'miscarriage of justice' or the verdict 'cries out to be overturned or shocks our conscience.'") (*quoting Williamson, supra*, at 1353). "Where, as here, the 'subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict' than in a more complicated matter." *Tokash*, 548 F. App'x at 800 (citing *Williamson, supra*, at 1352). Moreover, "a district court should not 'substitute its judgment of the facts and credibility of the witnesses for that of the jury.'" *Id.* at 800-01 (*quoting Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996) *and citing Shanno v. Magee Indus. Enters., Inc.*, 856 F.2d 562, 567 (3d Cir.1988)).

Applying the foregoing standard, the Court finds no basis to conclude that a new trial is warranted in this case. Plaintiff's argument in support of a new trial is premised on the assumption that the jury must have necessarily found that Plaintiff had been arrested prior to the

---

did not "file for judgment as a matter of law both before the case [was] submitted to the jury and after a verdict [was] returned," *Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 546 (3d Cir. 2010) (citing *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401-07 (2006)). *See also Yohannon v. Keene Corp.*, 924 F.2d 1255, 1262 (3d Cir. 1991) ("[T]he failure to move for a directed verdict … [i]n this circuit, … wholly waives the right to mount any post-trial attack on the sufficiency of the evidence."). The record before this Court indicates that Plaintiff did seek a directed verdict on the limited issue of lack of probable cause, but she did not move for a directed verdict based on any challenges relating to the issue of consent.

point at which she demanded a blood test. For the reasons previously discussed, this assumption is unwarranted because the verdict slip can reasonably be interpreted as a finding by the jury that Plaintiff was arrested only after she voluntarily consented to the arrest by demanding that she be taken for a blood draw. The trial record in this case contains ample evidence supportive of such a finding.

In answering the jury's question about when the Plaintiff is considered to be under arrest, Judge McLaughlin instructed the jury consistent with Third Circuit Model Civil Jury Instruction 4.12.2, which states that the following factors, among others, may be considered: the length of the interaction, whether the officer was diligent in pursuing the investigation or caused undue delay, whether the officer pointed a gun at the plaintiff, whether the officer physically touched the plaintiff, whether the plaintiff was moved to a police facility, and whether the officer stated that he was placing the plaintiff under arrest. As Trooper Petrof points out, consideration of these factors in light of the trial record supports a finding that Plaintiff was not arrested prior to her demand that she be taken for a blood draw. The entire incident, as reflected on the Pennsylvania State Police videotape, lasted less than thirty minutes;[11] however, the critical question is how much time had expired at the point that Plaintiff demanded the blood test. Both sides agree that Plaintiff's demand came in connection with Trooper Petrof's unsuccessful attempt to administer the portable breathalizer test, and the video reflects that this occurred approximately 8 to 10 minutes into the traffic stop. Trooper Petrof spent the remainder of the twenty minutes contacting his supervisor and awaiting transport assistance, while Plaintiff waited in her car for a friend to come and retrieve her dog. However, these latter twenty minutes are

---

[11] Trooper Petrof testified that the ending of the videotape reflects the arrival of the Bradford city policy cruiser and Trooper Palmer's departure from the scene in the state police cruiser, as Trooper Palmer had to transport a different DUI suspect to the hospital for chemical testing. According to Trooper Petrof, Plaintiff was placed under arrest, handcuffed, and placed into the city police cruiser immediately upon its arrival. (Trial Tr. vol. 2, pp. 60-61, 70.)

irrelevant to an arrest analysis because, by that time, Plaintiff had already manifested her consent. Thus, the evidence concerning the length of the interaction and the officer's investigative diligence supports a finding that Plaintiff had not yet been arrested at the time that she demanded the blood test. There is no suggestion that Trooper Petrof ever pointed a gun at Plaintiff or physically touched her prior to her demand for the blood test. Although Plaintiff was eventually handcuffed, told she was under arrest, and transported in a cruiser, this occurred only after she had already manifested her consent.

Plaintiff urges the Court to consider other relevant evidence in the trial record. She points to the fact that both Trooper Petrof and Trooper Palmer were present at the scene in full uniform, including firearms, nightsticks, pepper spray, and holding large flashlights. She points to the fact that she is considerably smaller than the Defendant. She also cites to her own trial testimony, wherein she asserted that Trooper Petrof was angry, yelled at her, repeatedly demanded that she take the PBT, waived the device in her face, and backed her up against her vehicle until she had no place to move.[12]

After careful review of the trial record, including the evidence cited by Plaintiff, this Court cannot say that the jury's verdict represents a "miscarriage of justice," "cries out to be overturned," or "shocks the Court's conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d at 1353; *Marra v. Philadelphia Housing Authority*, 497 F.3d at 309 n.18. The evidence of record to the Court's estimation supports the judgment as entered by Judge McLaughlin, and the Plaintiff has failed to demonstrate that the defense verdict entered by Judge McLaughlin is against the weight of the evidence.

---

[12] Based on this Court's review of the evidentiary record, the jury was required to resolve competing testimony and other evidence on this point and other material issues, and the Court cannot conclude that the record evidence was one-sided in a way that the jury was legally compelled to resolve them in the manner argued by Plaintiff. In light of the trial record, on this point, the Plaintiff's Motion is in essence a request that the Court substitute its assessment on such matters for that of the jury.

## IV.  CONCLUSION

Based upon the foregoing discussion, the Plaintiff's motion to amend or alter the judgment or for a new trial will be denied.  An appropriate order follows.

Mark R. Hornak
United States District Judge

Dated: May 12, 2014

cc:    All counsel of record.